ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | CASE NO.    1:09CR154 |
| | ) | |
| v. | ) | |
| | ) | Judge John R. Adams |
| THOMAS CUNNINGHAM | ) | |
| | ) | SENTENCING MEMORANDUM |
| Defendant. | ) | |
| | ) | |

**I.  Introduction**

On June 22, 2009, Defendant Thomas Cunningham pled guilty to one count of receipt and distribution of visual depictions of minors engaged in sexually explicit conduct, one count of receipt and distribution of child pornography, and one count of possession of child pornography. Cunningham filed a sentencing memorandum on November 6, 2009, and the Government filed its memorandum on November 25, 2009.  On December 15, 2009, this Court held an extensive hearing to entertain argument on the issues presented in the sentencing memoranda.   Cunningham then returned to Court on January 25, 2010, and this Court handed down sentence.   This memorandum serves to supplement the Court's oral statements given in support of Cunningham's sentence.

In sentencing Cunningham, the Court set out to treat child pornography in the same manner as all crimes.   The evidence was reviewed in its entirety, including the graphic pictures and videos taken from Cunningham's computer.   The true impact of the crime on its victims was taken into account.   Cunningham's past and present statements and activities were examined.   Following

that extensive review, the Court finds that a sentence of 121 months is sufficient but not greater than necessary to comply with the Sentencing Reform Act.

## II. Sentencing Process

Criminal sentencing is often described as a three-step process.   A district court must begin the process by calculating the advisory guideline range suggested by the United States Sentencing Commission.   *Rita v. United States*, 551 U.S. 338, 351 (2007) ("The sentencing judge… will normally begin by considering the presentence report and its interpretation of the Guidelines."). In so doing, the Court must determine the offense level for the crimes for which the defendant has been convicted and the defendant's criminal history. *See United States v. Boyd*, No. 3:07-CR-3, 2008 WL 4963198, at *14-16 (E.D.Tenn. Nov. 18, 2008).

Next, the Court must determine whether a variance or departure from the advisory guideline range would be appropriate.   *United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006).

> Finally, a sentencing court must independently evaluate each of the factors in 18 U.S.C. § 3553(a), which details the considerations that a district court must weigh before sentencing a criminal defendant. Although the Guidelines form a starting point in the district court's analysis under 18 U.S.C. § 3553(a), a district court may not presume that the sentence suggested by the Guidelines is appropriate for an individual criminal defendant.   A district court may hear arguments by prosecution or defense that the Guidelines sentence should not apply.   In this way, a sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. Ultimately, however, a court must exercise its independent judgment in sentencing a defendant.

*United States v. Stern*, 590 F.Supp.2d 945, 949 (N.D.Ohio 2008) (citations and quotations omitted).

2

### III.   Advisory Guideline Calculations

The base offense level for violations of 18 U.S.C. § 2252(a)(2) is 22.   U.S.S.G. 2G2.2(a)(2).   A two-level enhancement is appropriate as the images at issue depicted a prepubescent minor.   An additional two-level enhancement applies as the offense involved the distribution of images.   A further four-level enhancement applies as the images included sadistic or masochistic conduct.   A two-level enhancement for use of a computer also applies, and a final three-level enhancement applies based upon the number of images.   Accordingly, an offense level of 35 is appropriate prior to acceptance of responsibility.   A two-level reduction was granted for acceptance of responsibility, and the Court granted the Government's request for an additional one-level reduction for the same.   Accordingly, the final offense level for Cunningham's conduct is 32.

Neither the Government nor Cunningham objected to the Court's guideline calculation. Given the Cunningham's Criminal History Category of I, the advisory guideline range is 121 to 151 months.

### IV.   Kinds of Sentences Available

The final calculated advisory guideline range of imprisonment is 121 to 151 months.   The mandatory minimum for counts 1 and 2 is 5 years' imprisonment with a statutory maximum of 20 years, a $250,000 fine, and not less than 5 years to life supervised release.   Count 3 contains a statutory maximum of 10 years.

3

## V.  Departure

Defendant has not argued for a departure in this matter.   Furthermore, the Court finds no grounds to depart.[1]

## VI. Child Pornography, Generally

"There can be no keener revelation of a society's soul than the way in which it treats its children."[2]   Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.

Child pornography is a vile, heinous crime.   Mention the term to your average American and he responds with immediate disgust and a sense of unease.   However, once it enters the legal system, child pornography undergoes sterilization.   The sterilization goes far beyond properly removing emotion from sentencing decisions.   Images are described in the most clinical sense. Victims all too often remain nameless.   The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

Congress began its regulation of child pornography in the 1970s.   In so doing, Congress noted that its "legislation [was] designed to eliminate the exploitation of children in pornographic materials" and "to increase the deterrent effect" of then-existing statutes.   S.Rep. 95-438, reprinted in 1978 U.S.C.C.A.N. 40, 41 and 55.

> In this regard the committee feels that by greatly increasing the penalties for the sale and distribution of obscene materials – if those materials involve the depiction of sexually explicit conduct by children – the Congress is clearly expressing its abhorrence of child pornography. …

---

[1]  The Court notes that the PROTECT Act of 2003 amended 18 U.S.C. § 3553(b), precluding any downward departures in sexual exploitation cases other than those specifically detailed in the Guidelines.  *See* U.S.S.G. § 5K2.0(b).

[2]  Quote commonly attributed to Nelson Mandela.

4

> The committee feels that such [increased] penalties will provide adequate deterrence especially since the maximum penalty could be assessed for each violation and the most offensive cases would normally involve multiple violations.

*Id.* at 52. Sadly, Congress' efforts at deterrence were unsuccessful. In 2007, Congress heard testimony from Ernie Allen, the then-President of the National Center for Missing and Exploited Children. During his testimony, Allen stated that "today commercial child pornography is a multi-billion dollar industry worldwide, fueled by the internet." Even those that argue that the current sentencing scheme is too severe admit that the increase in the number of child pornography prosecutions has far outpaced any increase in the sentencing Guidelines. In 1994 and 1995, a total of 423 cases were prosecuted for all sex offenses against children, including but not limited to violations of the child pornography statutes. *See* U.S.S.C. Report to the Congress, Sex Offenses Against Children (June 1996). In 2008, 1,391 defendants were sentenced utilizing U.S.S.G. § 2G2.2, and another 175 were sentenced using U.S.S.G. § 2G2.1. *See* 2008 Sourcebook, available at http://www.ussc.gov/ANNRPT/2008/SBTOC08.htm. This increase occurred despite the fact that the mean sentence for such offenders in 1995 was 36 months and the mean sentence for those offenders in 2008 increased to nearly 120 months. *Id.*; *see also* Stabenow, Troy, "Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines" (hereinafter "Stabenow") (January 1, 2009), available at http://www.fd.org/pdf_lib/child%20 porn%20july%20revision.pdf. One district court has described the growth of child pornography as follows:

> The exploitation of children is pandemic. The most vulnerable members of our society have been exploited and discarded. Those who traffic in or consume child pornography must be punished severely. Indeed, the Supreme Court has recognized that punishing child pornography consumers is a compelling state interest. *See*

5

> *Osborne v. Ohio*, 495 U.S. 103, 110 (1990) ("[I]t is now difficult, if not impossible, to solve the child pornography problem by only attacking production and distribution.").

> Yet a spectrum of criminal culpability is involved in this crime. Those who produce and distribute these images are at one end of the spectrum. They deserve the harshest punishment. At the other end of the spectrum are men like [this defendant] who view these disgusting images. Rather than physically harming a child, their criminal act is complete by entering a market with a few clicks of a mouse. From my experience, most of these men, like [this defendant], have no prior criminal history. They usually have healthy family lives and productive careers. While these men bear responsibility for the horrors created by child pornography, any system of justice must attempt to emotionally remove itself from natural instincts of revenge and retribution. *See United States v. Baird*, 580 F.Supp.2d 889, 895 (D.Neb. 2008) ("It is clear that one possessing child pornography has far less culpability than one distributing pornography, who, in turn, has far less culpability than one who produces child pornography.").

> These pathetic men make easy targets. There is nothing redeeming or even understandable about this crime. But judges must objectively consider whether the sentences imposed further the goals of punishment. To do so, we must differentiate between those who create child pornography and those who consume it.

*United States v. Cruikshank*, 2009 WL 3673096, at *4 (S.D.W.Va. Nov. 6, 2009).

a. The Stabenow Argument

In his sentencing memorandum, Cunningham essentially presents the same argument espoused in Stabenow's article, namely that the child pornography Guidelines are not entitled to deference.  Prior to addressing the substance of this argument, the Court acknowledges its discretion to disagree with the Guidelines.

> However, even if it were true that district courts, based on the reasoning of *Kimbrough*, may impose below-guideline sentences for child pornography offenses solely based upon policy disagreements with those Guidelines, such does not entail that they must do so.

*United States v. Mikowski*, 332 Fed. Appx. 250, 256 (6th Cir. 2009) (footnote omitted); *see also*

*United States v. Huffstatler*, 561 F.3d 694, 697-98 (7th Cir. 2009) ("while district courts perhaps

have the freedom to sentence below the child-pornography Guidelines based on disagreement with the Guidelines, they are certainly not required to do so."). Moreover, the Court acknowledges that the Stabenow argument has been accepted by numerous district judges, including a judge within this district. *See United States v. Hanson*, 561 F.Supp.2d 1004 (E.D.Wis. 2008); *United States v. Stern*, 590 F.Supp.2d 945 (N.D.Ohio 2008). In so finding, those courts have held that "the guideline provisions relating to child pornography offenses of this nature do not reflect the kind of empirical data, national experience, and independent expertise that are characteristic of the Commission's institutional role." *Id.* at 960 (quoting *United States v. Ontiveros*, 2008 WL 2937359, at *8 (E.D.Wis. July 24, 2008)).

Cunningham primarily presents two arguments surrounding the validity of the child pornography Guidelines. Cunningham first points to the fact that Congress has routinely required the Commission to increase the penalties for child pornography, effectively negating the Commission's ability to independently determine the appropriate sanctions based on empirical evidence. Cunningham also argues that many of the child pornography enhancements apply in nearly every case, resulting in unduly harsh sentences for "average" offenders. The Court finds no merit in either argument.

1. Congressional Influence

There can be no dispute that Congress has repeatedly instructed the Commission to modify the child pornography Guidelines. Moreover, there is no dispute that one of the changes, the Feeney amendment, was made with little to no input from the Commission. While Congress' actions give rise to some concern, they are also easily explained.

Crimes involving the exploitation of children provide fertile ground for grandstanding

7

politicians.   Public outcry is always at its loudest following media coverage of a crime involving a child victim.   As such, it comes as little surprise that Senator Jesse Helms used inflammatory language in 1991, calling on tougher penalties for "smut peddlers and pedophiles," when Congress sought to have the Commission amend the Guidelines.   Based on that language, it is simple to conclude that the Guidelines were modified for no other reason than to serve as campaign fodder for public officials.   However, while the Commission made changes to the Guidelines on October 28, 1991, the Helms-Thurmond Amendment changes were foreshadowed.   A 1990 State Report generated by the Commission recommended two of the same changes included in the Congressional act: "increasing the base offense level for §2G2.2 from 13 to 15, and including a specific offense characteristic at §2G2.2 for pattern of abuse."   The History of the Child Pornography Guidelines, at 24-25, available at www.ussc.gov/general/20091030_History_Child _Pornography_Guidelines .pdf.

After the 1991 amendment, Congress continued to pass acts that affected the Guidelines. In December of 1995, Congress passed the Sex Crimes Against Children Prevention Act.   In 1998, it passed the Protection of Children from Sexual Predators Act.   In 2003, the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act was passed.   The PROTECT Act was the first and only time Congress has directly amended the child pornography Guidelines.   The Act added the image table to the Guidelines and also added the enhancement for possessing sadistic or masochistic images.   Following the passage of the PROTECT Act, the Commission conducted a number of studies regarding the Guidelines, including the following:

- A prison impact analysis that used 2002 data to report how the 2004 amendments to §§2G2.2 and 2G2.4 directly mandated by Congress would likely impact sentences. This analysis revealed that average sentences for §2G2.2 would likely more than

double from 42.8 months to 88.8 months. Those previously sentenced under §2G2.4 were predicted to see a similarly large average increase in sentence from 28 months to 54 months.

- An examination of state sentencing practices for child pornography offenses in Florida, Oklahoma, Massachusetts, North Carolina, Oregon, Pennsylvania, South Carolina, Tennessee, Virginia, and Washington. The results were ultimately ambiguous due to differing data collection models in each state, but such information was considered during the policy development process.

- A project examining offenders sentenced under §§2G2.2 and 2G2.4 to determine the statute of conviction; the offender's most serious behavior; any inappropriate contact with a minor by offender; travel by victim or offender; arrest due to a sting operation; age of victim; number of victims; use of a computer by offender; pattern of activity by offender; offender's criminal history (particularly, the existence of prior offenses against persons); existence of plea agreement; history of substance abuse by offender; psychological evaluation of offender; and offender's marital status. The project also examined departure rates in child pornography cases. The results informed the drafting of proposed amendments and identified issues for comment. It also permitted the Commission to understand the likely rates at which new enhancements would apply.

History at 41-42. Moreover, despite Congress directly amending the Guidelines, the Commission was still required to implement those Guidelines. For example, "the Commission had to define the term 'images,' quantify video images, and implement the directive." *Id.* at 43. "Given that the image table enacted by Congress assigned a 2-level increase for between ten images and 150 images, and a 3-level increase for 150 to 300 images, the Commission adopted a definition of video that considered each video to contain 75 images, squarely in the middle of the 2-level increase range." *Id.* at 43-44.

The Commission was also tasked with implementing appropriate base offense levels that took into account the five-year statutory mandatory minimum.

After engaging in extensive analysis of its data, including a review of typical trafficking and receipt offenders, offense characteristics, and rates of below guideline sentences for these offenses, the Commission adopted the third, most

9

> lenient option of those typically used by the Commission, and selected base offense
> level 18 for possession offenders and base offense level 22 for trafficking and
> distribution offenders.
>
> The Commission's analysis revealed that a majority of offenders sentenced under
> §2G2.2 were subject to specific offense characteristics that increased their offense
> level. Specifically, the overwhelming majority of these offenders received a
> 2-level enhancement for use of a computer (89.4%) and a 2-level enhancement for
> material involving a child under 12 (91.4%).

*Id*. at 46. The Federal Defender's office agreed that setting the base offense levels below the

mandatory minimum was appropriate. *Id*. at 47.

> The Commission's research and review of comments indicated that if it placed the
> base offense level at 26, or even 24, after applying the typical enhancements, most
> first-time offenders' Guidelines calculations would be far in excess of the
> mandatory minimum. However, setting the base offense level at level 22 would
> permit the Guidelines and enhancements to operate in conjunction with the
> statutory mandatory minimum.

*Id.*

Finally, the Commission undertook a proportionality review of the Guidelines prior to

finalizing its base offense level analysis. "This review demonstrated that if the base offense level

were set any higher than 22, the typical offender sentenced under §2G2.2 for receipt of child

pornography would face a higher guideline than a typical offender convicted of conspiracy to

commit murder and kidnapping. Thus by setting the base offense level at 22 for trafficking, the

Commission sought to preserve proportionality, avoid double counting, and provide a wider

sentencing range for defendants than would be otherwise available." *Id*. at 48.

Having reviewed the actions taken by the Commission, the Court finds that giving

deference to the Guidelines is appropriate. We are often told that when life gives you lemons,

make lemonade. In this instance, the Commission was given grandstanding politicians, but still

crafted proper Guidelines.   Rather than cede its responsibility, the Commission instead appears to have gone above and beyond to justify its amendments.   Far from failing to rely on empirical data and its own expertise, the Commission has conducted formal studies whenever possible and has conducted extensive analyses to fulfill its statutory obligations.   Have politicians unduly hampered the Commission's ability to perform its duties?   There can be no question that they have interfered.   However, at the same time, Congress' actions could be viewed as a necessary response to a crime that was spiraling out of control.   As internet access grew across this country, so did the online community of pedophiles that supports the market for child pornography. Rather than remain silent, Congress acted.   In turn, the Commission used empirical data and its own expertise to craft the appropriate Guideline amendments.   This Court, therefore, declines to join those district judges that have found otherwise.

    2.  <u>Common Enhancements</u>

Cunningham also asserts that this Court should take into account the frequency with which certain enhancements apply.   Cunningham's argument in this regard is troubling to the Court.

There is no dispute that certain enhancements apply in nearly every child pornography case.   The 2-level enhancement for use of a computer applies in 96.5% of cases.   The 2-level enhancement for images involving a prepubescent child applies in 95.5% of cases.   The enhancement for possessing sadistic or masochistic images applies in over 60% of cases.   Based on the frequency of the application of these enhancements, Cunningham seems to contend that his sentence should be lower.   This argument suffers from several fatal flaws.

Initially, the Court notes that the frequency of the enhancements was expressly acknowledged by the Commission when it set the base offense levels for these offenses.   The

Commission was clear that it took into account the frequent use of these enhancements when it set the base offense levels.   For example, the base offense level herein is 22 and results in a sentencing range of 41 to 51 months, or 9 to 19 months *below* the mandatory minimum.   The bottom of the Guideline range remains below the mandatory minimum until a 4-level increase to offense level 26, resulting in a 63 to 78 month range.   Applying the two most common enhancements, the use of a computer and possession of images of prepubescent children, generates a level 26 offense.   In other words, once the two most common enhancements are applied, offenders effectively start off at the mandatory minimum.   If the Court factors in acceptance of responsibility, an additional 3-level enhancement could occur, followed by the deduction for acceptance of responsibility, and the Guideline range would remain near the mandatory minimum. In other words, the Court could find that seven levels of enhancement are appropriate, yet still be in position to sentence an offender to the mandatory minimum with only a 3-month variance.   The Court, therefore, affords little weight to the fact that some enhancements apply in nearly every instance.   It is clear that the Guidelines have taken this factor into account.

The Court further notes that the same argument was contained in Stabenow's article.   In making the argument, Stabenow concludes, "The flaw with U.S.S.G. § 2G2.2 today is that the average defendant charts at the statutory maximum, regardless of Acceptance of Responsibility and Criminal History."   Stabenow at 23.   This assertion is flawed in several respects.   First, it is undermined by the very data upon which Stabenow purports to rely.   The mean sentence for child pornography offenses is roughly 120 months, well below the statutory maximum of twenty years. This average was achieved with less than one-third of defendants receiving downward variances or departures, and nearly no upward departures or variances.   *See* 2008 Sourcebook, at Table 28.

12

Based on those facts, if the "average offender" charted at the statutory maximum of 240 months, the average sentence would be much higher than 120 months. Instead, even taking into account the one-third downward variance ratio, the average Guideline range is significantly lower than 240 months. Stabenow's argument that the average offender charts out at the maximum is therefore fatally flawed.

More troubling to the Court is that Stabenow's argument contains the same form of sterilization that is prevalent throughout the legal system when dealing with child pornography. Stabenow blandly references the "average offender" when asserting that it is a travesty that sentencing ranges are so high. The term "average offender," however, goes undefined. A closer examination of "average" when used by Stabenow is disturbing. In order to chart out at the statutory maximum, a first-time offender must reach an offense level of 40 prior to acceptance of responsibility. To reach that level, the offender must have images of a prepubescent minor (+2 levels), distribute the images for value (+5 levels), possess images that are sadistic or masochistic (+4 levels), use a computer (+2 levels), and either engage in a pattern of abuse (+5 levels), or possess more than 600 images (+5 levels). It is only then that an offense level of 40 would be achieved. With acceptance of responsibility, a Guideline range of 210 to 262 months would be computed. In order to chart out *above* the statutory maximum, offense level 39 or above, the offender would need to both possess over 600 images and have engaged in a pattern of abuse. Thus, the term "average offender" is significantly misleading. Once one realizes that Stabenow describes an individual owning more than 600 images of prepubescent child pornography containing sadistic and masochistic images as "average" without any further description, it is somewhat easier to understand why he believes the Guidelines are too harsh. This is to say

13

nothing of the fact that even at level 37, a district court would have the ability to sentence an offender to *thirty months* below the statutory maximum without any variance.

Finally, the entirety of this argument is somewhat confusing to the Court.  The fact that certain enhancements apply on a frequent basis does not serve as a basis for negating the Guidelines.  If anything, the fact that more than fifty percent of offenders have over 300 images and that over sixty-percent have sadistic and masochistic images supports a conclusion that even more harsh sentences are required for deterrence.

The assertion that sentences should be reduced because it is easy to accumulate a large number of pictures quickly also rings hollow.  The Court does not dispute that it is very likely that a defendant could acquire more than 600 images with just a few mouse clicks and several emails.  But that number of images is not collected by accident.  Instead, those images are sought out by a troubled mind, from like-minded individuals.  Thus, a defendant makes a cognitive choice to seek out that level of images.  Moreover, the Court has never before seen an argument that because a crime is easy to commit, it should be punished less severely.  Robbery is certainly simplified from the criminal's perspective by the use of a firearm and the choice of a feeble, elderly victim.  The Guidelines, however, do not lessen punishment because the crime was easier to commit.  In fact, seeking out a vulnerable victim leads to a 2-level enhancement under the Guidelines.  U.S.S.G. § 3A1.1(b)(1).  This Court, therefore, will not alter its sentence simply because accessing and growing a database of child pornography has become easier as technology has advanced.

In conclusion, the Court rejects any contention that the Guidelines should not be given deference.  However, the Court also notes that even if it were to disregard the Guidelines in their entirety, its sentence would not change.  That is, applying only the § 3553(a) factors without

14

deference to the Guidelines, the Court would impose the identical sentence detailed herein.

**VII. Variance and § 3553(a) Factors**

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in exercising its judgment to determine an appropriate sentence and must offer a reasoned explanation for the sentence. Based upon those factors, the Court finds that no variance is appropriate under the facts presented in this matter.

In reaching its conclusion, the Court considered the nature and circumstances of the offense and the history and characteristics of the defendant. The Court must also review the need for the sentence imposed: a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; b) to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the Defendant; and c) to provide the Defendant with needed educational or vocational training, medical care, and/or other correctional treatment in the most effective manner.

    1.   <u>Nature and Circumstances of the Offense</u>

Cunningham became the subject of a federal investigation after the New Waterford Police Department conducted an online child exploitation investigation in January of 2008. During that investigation, an undercover officer received several emails from an individual with the screen name "LOVEMACH72." The emails contained attachments that included images of child pornography. The officer discovered that the emails had been forwarded from the account of DOWNRANGE12@aol.com. A search warrant was executed on that account and the search revealed that "DOWNRANGE12" had received images from an America Online user named "UNCLETOMMY01." A search warrant for that name revealed an account owned by

15

Cunningham.

A further search of the account revealed that numerous emails were sent between January 31, 2008 and April 2, 2008, each containing child pornography.   The presentence report describes the contents of those images at pages 4 through 9.   Those descriptions are hereby incorporated herein.   However, the Court will reiterate several of those descriptions herein to demonstrate an earlier point:

> "alfred11.jpg." – This image depicts a prepubescent female, with no breast development, no pubic hair, appears young in appearance and is diminutive in stature, especially her arms, hands, legs, and buttocks, engaged in the lascivious exhibition of the pubic/genital area.   The prepubescent female is wearing a shirt that is pulled up to her chin, while she is leaning back with her legs spread apart, exposing her vagina; what appears to be an adult male is spreading her vagina. The picture is taken from just in front of the prepubescent female's vagina.
> …
>
> "004.jpg" – This image depicts a prepubescent female with no pubic hair and who is diminutive in stature, especially her legs and hip area, engaged in genital-genital sexual intercourse with an adult male.

PSR at 4-5.   In total, more than 130 images were found on Cunningham's computer.   An additional fourteen images and a video were recovered from his email account.   It is the Court's understanding that the above-quoted descriptions were provided by Immigration and Customs Enforcement Agent Gabriel Hagan.   In an effort to more fairly judge the nature and circumstances of this offense, the Court personally reviewed all of the images and videos.

The Court made its request to view the images shortly before the first sentencing hearing in this matter.   At that time, Agent Hagan expressed surprise that the Court wished to review the images in their entirety.   Agent Hagan indicated to the Court that she had been the affiant in more than 100 child pornography investigations and, absent a matter going forward to trial, a judge had

16

never requested to view the photographs at issue.   While only a minor sampling, this revelation was shocking to the Court.[3]   As detailed above, the agents handling these matters are able to aptly describe the contents of each image.   Those descriptions, however, are little more than words on paper.   Absent examining the images, one cannot get a true sense of the depravity that they depict. Thus, the Court implores any reviewing Court to personally examine the images at issue and not simply rely on a written description of their contents.   The Court acknowledges that the review of such images is, to say the least, uncomfortable.   There are some images that are haunting, and they cannot be unseen.   However, any uneasiness felt by the individual reviewing the image pales in comparison to the harm caused by the image being created in the first place.

The image "004.jpg" does in fact depict a prepubescent female engaged in sex with an adult male.   That written description cannot convey the true nature of the image.   The image depicts a little girl, likely no more than eight years old.   She has a vacant look to her eyes, as if even at her tender age, she understands the cruelty of the event taking place and the impact it will have on her for the rest of her life.   Moreover, viewing such a young girl being violated by adult, male genitalia gives the viewer an understanding of how heinous the crime truly is.   One cannot describe in writing that image.   Rather, one has to see the dull, often vacant expressions of the victims to get an ounce of the proper emotions expressed in those images.

2.   Seriousness of the Offense

In examining the seriousness of the offense, the Court must review the harm to the victims.

---

3 At least one other district court has recognized that judges rarely view the images at issue in child pornography matters.   *See United States v. Fiorella*, 602 F.Supp.2d 1057, 1075 n.8 (N.D.Iowa 2009) ("It is easier to overlook the horrors of child pornography when, as is often the case, the material at issue is not presented to the sentencing judge. For purposes of efficiency and minimization of re-victimization of the children depicted, the government and the defendant will often (and rightly so) enter into stipulations about the number and nature of the photographs at issue. But the horrors of child pornography are real even if those who sit in judgment do not have occasion to view them.").

While courts and scholars have tried to explain the effects on victims, the Court in this matter has the benefit of victim impact statements.   In reviewing Cunningham's images, the Government was able to identify two of the victims in those images.   The two victims describe in detail the lingering effects of their abuse.   One, now seventeen years old, describes her life as follows:

> I block my room at night from anyone seeing me when I sleep.   I will never answer the door even my mom is home.   I trust nobody! ...
>
> I have had night mares, migraines and I have lot's of problems sleeping.   I don't trust anyone but my mom and I will never trust a photographer again…. I have had stomach ulcers and weight loss and just the thought of what they are doing makes me want to throw up.   (Sic throughout.)

Another identified victim, now eighteen years old, offers a similar description:

> I tried to kill myself and didn't want to live. … I will never forget what these people have done to us.   I don't take any photo's with photographers…. I will not answer my phone unless I know who it is.   I do not open my window or my blinds in my room.   I still like to sleep with my mom.   I don't stay home alone.   I received many scholarships to colleges away from home and I did not take any of them. … I just don't know if I will ever get over some of these things.   Once you have been affected by a predator they never really leave you.   I have night mares, dreams and anxiety thinking they are going to get us[.]   (Sic throughout.)

While heart-wrenching to read, the letters lack the emotion that could be conveyed in court and that would perhaps finally begin to impact defendants like Cunningham.   Nevertheless, they amply demonstrate the seriousness of the general offense of child pornography.

3.   <u>Adequate Deterrence</u>

In arguing for a variance, Cunningham asserts that he has a very low risk of recidivism.   In so arguing, Cunningham relies upon the Commission's publications regarding recidivism.   Based on his lack of a criminal history, Cunningham asserts that his risk of reoffending is only 6.2%.   The Court finds that this generalized data does not warrant reliance when examining the risk of

recidivism of a particular individual. For that matter, Congress has repeatedly reiterated that recidivism rates are particularly high for child sex offenders. *See* Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val. U. L. Rev. 1155, 1192, n. 150 (2009) (compiling Congressional statements regarding the high risk of recidivism among child sex offenders). Similarly, the Eleventh Circuit has recently noted that "child sex offenders have appalling rates of recidivism and their crimes are under-reported." *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008). In addition, one study of sex offenders found an overall recidivism rate of 31.7%. Kingston, Drew, et al., *Pornography Use and Sexual Aggression: The Impact of Frequency and Type of Pornography Use on Recidivism Among Sexual Offenders*, Aggressive Behavior, Volume 34 (2008) (also available at www.courseweb.uottawa.ca/PSY3171/personal wp/p33%20Pornography%20Paper%202007a%20%20July%202007.pdf). The predicted odds of recidivism increased by 177% among the offenders that viewed deviant pornography, such as child pornography. Moreover, the predicted odds of violent recidivism, including sexually violent recidivism, increased by 185% for this group. The predicted odds of any type of sexual recidivism increased by 233% for the group that admitted to viewing deviant pornography. This increased risk of recidivism among sexually deviant offenders has also been found in earlier studies, including a meta-study from 1996. *See* Hanson, R. Karl, and Monique Bussiere, *Predictors of Sexual Recidivism: A Meta-Analysis*, available at home.wanadoo.nl/ipce/library _two/han/hanson_96_txt/pdf. The Court finds that these category-specific rates of recidivism are more appropriate when considering the need for adequate deterrence.

Moreover, even if the Court were to start with the lower rates contained in the

19

Commission's data, the Court would find that Cunningham's likelihood of recidivism is greater than those published rates.   Cunningham has over and over again indicated that he used child pornography as a coping mechanism during a period of time when his life was in shambles.   From that perspective, Cunningham fails to recognize the significance of his own actions.   Many individuals go through periods of severe depression with little to no support from family and friends.   A vast majority of those individuals do not resort to online communities of child pornography to address their loneliness.   It is clear to the Court that there is some underlying issue that has caused Cunningham to seek out child pornography.   Until Cunningham receives some treatment, discovers that issue, and confronts it, the Court believes he is at a significant risk of reoffending.   In response, Cunningham asserts that he now has a more stable life and has no need for that type of material going forward.   While that may be true in the short term, it does little to address the likelihood of Cunningham's returning to child pornography during the next downturn in his personal life.   As such, the Court finds that a significant sentence is necessary to deter Cunningham from reoffending.

In addition to deterring Cunningham, the Court is also mindful of the need to deter other offenders.   As has been highlighted throughout, end users are the cogs in the wheel that drive the demand for child pornography.   As technology progresses, the recipients of these images are becoming more and more difficult to find and prosecute.   Millions of dollars are spent each year in the hopes of finding those consuming these images.   As such, the Court finds it important to impose an appropriate sentence to alert end users to the fact that receipt and distribution in and of itself is a heinous crime deserving of a severe punishment.

4.  Characteristics of the Defendant

Cunningham presents to the Court as a fifty-four year old man.   He was a middle child, with both an older and younger sister, who reports that he had a normal childhood and that he was raised in a loving and supportive environment.   Cunningham left high school early and joined the United States Air Force.   He married while he was enlisted in 1976.   He separated from his wife in 1980, but they were not officially divorced until 1995.   At the time of his arraignment, Cunningham indicated that he had been in a relationship for nearly three years.

Prior to his sentencing, Cunningham voluntarily submitted to a psychological examination. The Court finds that the examination provided little insight into Cunningham's mental condition and has therefore given it little weight.   The examination utilized the MMPI Inventory-2 and the Rorschach Inkblot Test.   There is little to no mention in the report of Cunningham's consumption of child pornography.   For that matter, the Court is certain that the doctor did not examine the materials that were seized from Cunningham's computer.   The examination resulted in an Axis I diagnosis of Major Depressive Disorder and an Axis II diagnosis of Dependent Personality Disorder.   Neither diagnosis serves to explain Cunningham's choice to view child pornography.

One finding of the examination was troubling to the Court:   "Results from psychological testing also reveal a tendency to minimize the extent of problems[.] … He also has strong dependency needs and has a strong propensity toward making poor decisions."   The fact that Cunningham tends to minimize the extent of his problems is significant.   When interviewed for the presentence report, Cunningham stated that "It wasn't until very early 2008 that I became actively involved with illegal porn."   Cunningham stated that prior to that time he had downloaded an extensive amount of adult pornography.   Cunningham also indicated as follows:

21

"I went through my computer and deleted not only the illegal stuff but ALL porn." Cunningham's statements, however, are refuted by the evidence before the Court.

Special Agent Hagan testified during Cunningham's sentencing hearing.  During her testimony, Hagan indicated that the files retrieved from Cunningham's computer included data files that indicated the creation date of the images and their "last accessed" date.  Hagan's review demonstrated that Cunningham had images of child pornography that were saved on his computer as early as 2005.  Cunningham failed to refute this fact in any meaningful manner.  Moreover, Hagan's testimony made it clear that images of child pornography remained on Cunningham's computer.  A vast majority of the images were not recovered from deleted space, but remained in a folder on Cunningham's computer.  Thus, both of Cunningham's statements that tended to minimize his involvement in child pornography were refuted by the evidence.

There are two possible explanations for this outcome.  The first is that Cunningham downloaded so much adult pornography in 2005 that some child pornography found its way on to his computer.  If true, that conduct only serves to demonstrate the reckless manner in which Cunningham used pornography, legal or not, as a coping mechanism during the negative times in his life.  Moreover, Cunningham could be so unsophisticated with respect to technology that he simply failed to delete all of the pornography off of his computer, despite his intentions.  However, given the psychological report in this matter, it is more likely that Cunningham simply attempted to minimize his wrongdoing.

Despite that conclusion, there is one fact that weighs in favor of Cunningham.  Prior to any knowledge of an investigation, Cunningham stopped accessing the pornography.   Again, that could be pure happenstance.  However, the evidence seems to demonstrate that pornography,

22

both child and adult, was Cunningham's outlet when his life was not going well.   By all accounts, he stopped accessing such pornography once his life improved.   The Court has taken that fact into account in fashioning its sentence.

Additionally, the Court notes that it is not simply the images of child pornography that are disturbing to the Court.[4]   Also seized from Cunningham's computer were images of a young girl, the niece of Cunningham's then-girlfriend.   Cunningham "denies any sexual intent in taking these photographs, many of which were taken during a pool party attended by 20 other adults."   The Court could accept this explanation on its face if the photographs were simply those of children at play.   They decidedly are not.   It is true that some of the images depict little more than children at play.   For that matter, it could be nothing more than bad luck that Cunningham maintained the pictures and that several of them feature children "crab-walking" with their pubic regions at the front and center of the photographs.   However, to draw this conclusion, the Court would need to ignore two highly relevant facts.   First, several of the images are cropped in such a manner that only the child's pubic region or buttocks is shown.   For example, an image labeled "6e6.thm" shows only a child's buttocks.   Image "6f5.thm" shows a child from the waist down only.   Image "72a.thm" shows a child from the neck down.   Image "72b.thm" shows the same child, but the sole contents of the picture are her pubic region.   The same description applies to image "72e.thm."

Whether the images were later cropped using photo software or focused on the pubic region when taken is irrelevant to the Court.   At some point in time, Cunningham found it

---

[4]   The Court notes that it used the term "relevant conduct" at times during Cunningham's sentencing hearing.   The term was not meant in the legal sense as defined by the Guidelines, but rather as a term of art.   Specifically, the Court finds this conduct relevant to its review of Cunningham's personal history and characteristics.

23

appropriate to use a child in his life to further his interest in child pornography.   The evidence submitted by the Government further indicates that at least one of the images of the niece was attached to an email sent to "sxyflagirl19" with a subject line that read "Glad you liked it" and "mmmmmmmmmm."   Thus, the circumstantial evidence strongly supports that Cunningham was, at a minimum, using photographs of a child he knew in order to build bonds with other pedophiles and likely to obtain more child pornography in the future.   In that same vein, Cunningham sent out an email, attaching to it a photograph of his sister when she was a child. The subject line of that email read:  "my younger sister I did her at this age."   While the remaining evidence does not support that Cunningham in any way molested his sister, the email and its subject line demonstrate the lengths that Cunningham was willing to go to fit into this online society of pedophiles.

Finally, the Court is also particularly disturbed by a video created by Cunningham.   On April 2, 2008, an individual named "Lovtolick6868" emailed an image to Cunningham that consisted of a clothed toddler named Carol.   Cunningham emailed a video back to Lovtolick6868 after receiving the image.   The video was footage of Cunningham masturbating onto the photograph of the toddler.   During the video, Cunningham speaks as if he the photograph is a real child and he is acting out a fantasy.   Having reviewed the video, the Court finds that the Government accurately paraphrased the contents of Cunningham's statements as follows:

> Hi, Carol baby.   I like how you're looking at my cock.   You want to hold it, don't you baby?   Daddy wants me to cum on you.   I bet daddy would like to eat your pussy while I cum on you, baby.   Would you like that, baby?   Suck it, baby. Come on, Carol, suck it.   Suck it for uncle.

The fact that Cunningham described a fantasy that includes raping a toddler is beyond

words.   It becomes even more troubling after a review of a recent scientific study that addresses whether those that view child pornography may be more prone to commit in-person sex offenses. Very recently, a study was conducted that

> compared two groups of child pornography offenders participating in a voluntary treatment program:  men whose known sexual offense history at the time of sentencing involved the possession, receipt, or distribution of child abuse images, but did not include any "hands-on" sexual abuse; and men convicted of similar offenses who had documented histories of hands-on sexual offending against at least one child victim.

Bourke, Michael L. and Andres Hernandez, *The 'Butner Study' Redux: A Report of the Incidence of Hands-On Child Victimization by Child Pornography Offenders*, Journal of Family Violence, Volume 24, Issue 3 (April 2009).   The study included 155 sexual offenders that had enrolled in an intensive, residential, sex-offender treatment program.   115 of the offenders had no documented hands-on victims that were known at the time of sentencing.   The remaining 40 offenders had identified a total of 75 victims at the time of their sentencing.   By the end of treatment, however, only 24 offenders denied that they had committed a hands-on offense.   In other words, 91 of the 115 offenders that had previously denied such conduct had admitted to hands-on conduct during treatment.   Of the 115 that had previously denied any victims, those thereafter admitting to hands-on offenses admitted to 8.7 victims on average.   Those that had previously admitted hands-on offenses disclosed an average of 19.4 victims.   "The dramatic increase (2,369%) in the number of contact sexual offenses acknowledged by the treatment participants challenges the often-repeated assertion that child pornography offenders are 'only' involved with 'pictures.'" The study went on to note that of the 24 offenders that continued to deny any hands-on offenses, nine were polygraphed on the issue.   Only two of those nine passed.

25

Based upon their findings, the authors concluded that they believe that "there exists a complex and reciprocal interaction" between viewing child pornography and contact sexual crimes. However, due to the "paucity of empirical research in this area," the study could not draw formal conclusions. *But see*, Endrass, Jerome, *The Consumption of Internet Child Pornography and Violent and Sex Offending*, BMC Psychiatry, available at www.biomedcentral.com/1471 -244X/9/43 (concluding that "[t]he consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses"). Based on the limited nature of both studies, this Court cannot draw formal conclusions about the correlation between contact sexual offenses and the viewing of child pornography. The sample size at issue was small in both, 155 offenders in the Butner study and 231 offenders in Endrass' study. This Court, therefore, will not draw broad conclusions from the data derived from the study.

The *Butner Study,* however, certainly raises the prospect that a correlation exists between viewing deviant pornography and committing a hands-on offense. This conclusion is further bolstered by the sexual and violent recidivism rates reported by Kingston, *supra.* Given Cunningham's willingness to act out a rape fantasy with the photograph of a toddler, even a remote possibility of a correlation between viewing child pornography and committing a hands-on offense is deeply troubling to the Court.

Cunningham's willingness to use pictures of children from his life is also disturbing. In examining the results of their study, the *Butner Study* authors indicated as follows:

> While we concede the possibility that some individuals who download and view child pornography may not experience certain negative effects (e.g., reinforcement of pedophile arousal patterns, desensitization to the harm inflicted upon the victims, behavior disinhibition), we have not encountered such individuals in our clinical practice. In our work with these offenders, we have found that exposure to

26

> child pornography, as well as the cultural and technological context in which it is exchanged, has an insidiously deleterious effect on them. It normalizes child/adult sexuality, dehumanizes children, and desensitizes the offender to the harmful consequences of child victimization. These effects are further exacerbated by the offender's immersion in cyber-communities of similarly socially marginalized and sexually deviant individuals. These online communities not only serve as online "trading posts" for illicit material, they also provide social validation, a sense of belonging, and support.

Cunningham's willingness to use the photographs of the niece of a loved one demonstrates the deleterious effects described above. According to Cunningham's own words, he would never have done something to harm that child. However, he became so desensitized by his viewing of child pornography, he was willing to forward her picture on for viewing by what he knew to be pedophiles. His willingness to do so no doubt enhanced his ability to "trade" for new pictures among that online community. Finally, Cunningham himself admits that he turned to child pornography when his life was in disarray. As such, it is likely that the online community that causes so much harm around the world provided him with a sense of belonging and support that he felt was missing from his life.

Finally, Cunningham was also given the opportunity to speak during his sentencing. The Court finds Cunningham's statements less than compelling. Like many child sex offenders, Cunningham repeatedly apologized to his own family. He asserted that he was sorry for the pain and embarrassment he caused to his own family. He also attempted to minimize his culpability by repeatedly referencing the fact that a majority of his downloading and internet activity involved only adults. Cunningham never directly apologized for the harm to the victims that resulted from his conduct. Instead, Cunningham indicated that it was not until after his arrest that he realized the "terrible harm" associated with his conduct. While Cunningham purports to be remorseful,

his remorse seems more focused on being sorry that his activities were discovered and became known to his family. Very little, if any, of his remorse is predicated on the harm he caused. The Court, however, has taken all of his statements into account in fashioning its sentence.

Finally, the Court has not in any manner discounted the impact of its sentence on Cunningham's family and friends. The Court heard from Cunningham's fiancée and his two sisters. All expressed support for him and surprise that he had engaged in such deviant behavior. As such, the Court has taken into account that their lives will be altered by having Cunningham incarcerated.

5. § 3553(a) Conclusion

The Court has carefully considered all of the above, as well as all of the evidence submitted during Cunningham's hearings and attached to his sentencing memorandum. Cunningham's overarching argument is that his conduct is not as deplorable as others involved in child pornography. Cunningham has repeatedly suggested that he is not the worst of the worst and that in fashioning a sentence, this Court must leave room above his sentence for those committing worse acts and for those with a higher criminal history category. The Court acknowledges both of these arguments.

Cunningham is correct that he is not the worst of the worst. Having reviewed the images and video at issue, the Court can state that Cunningham's collection is small, relative to other offenders. Moreover, a majority of Cunningham's images consisted solely of nude, prepubescent females. That is not to minimize the harm caused by the creation of these images, but Cunningham is correct that there is a continuum in child pornography, and those images that do not depict sadistic or masochistic conduct fall near the lower end of that continuum.

28

Cunningham's request for the mandatory minimum, however, is not well taken.

First, while not the majority of the images, Cunningham did have images that contained sadistic and masochistic conduct.   The sole video on his computer included images of a little girl performing oral sex on an adult male.   Other photos included genital-genital intercourse between an adult male and a little girl.   Still another photo included a photo of a little girl with ejaculate across her mid-section.   Thus, Cunningham's collection is not at the bottom of the continuum.

Second, Cunningham did more than just idly collect child pornography.   He actively engaged in the distribution of child pornography.   Cunningham seeks to excuse this activity because it is commonplace among those involved in viewing child pornography.   Cunningham effectively contends that "trading" is the sole way in which images are collected.   While this may be a common occurrence in online pedophile communities, it does not lessen its impact.   Such trading continues to drive the demand for new images, and thus new abuses on children.

Cunningham also verbally acted out the fantasy of raping a toddler; a highly disturbing act.   While Cunningham denies any intent to ever commit a hands-on offense against children, his willingness to act out such a fantasy to "fit in" to the online community causes a great deal of concern to the Court.

The Court has carefully considered Cunningham's argument that it must leave room above his sentence for more egregious offenders.   With respect to those offenders that commit the same acts as Cunningham but have a higher criminal history category, the Court notes that the Guidelines do not create any concern.   At an offense level 32, Cunningham's range is 121 to 151 months.   A Criminal History Category II offender would have a range of 135-168; Category III would be 151 to 188 months; Category IV would be 168 to 210 months; Category V would be 188

29

to 235 months; and Category VI would be 210-262. Accordingly, it would only be at the highest criminal history category that the statutory maximum would be included in the Guideline range. As the Court has determined that a within-Guideline sentence is appropriate, it also concludes that the Guidelines provide adequate room for sentencing offenders with more significant criminal histories.

The Court is also mindful that Cunningham's collection is not the worst of the worst. For example, the Third Circuit described that the image collection of a defendant in *United States v. Parmelee*, 319 F.3d 583, 585, n.3 (3d Cir. 2003). Among other images, Parmelee had images that included a minor girl screaming in pain and numerous images depicting minor girls being penetrated by inanimate objects. *Id.* Within this Circuit, a defendant has admitted to possessing "images of adult males engaging in sexual activity with infants." *United States v. Cole*, 329 Fed. Appx. 613, 614 (6th Cir. 2009). In *Pugh*, the defendant's collection "included a video of an adult male raping an infant girl and a picture of an adult male having sex with a toddler with a dog collar around her neck[.]" *Pugh*, 515 F.3d at 1193. Thus, by comparison, the *type* of child pornography possessed by Cunningham warrants against a sentence approaching the statutory maximum.

Similarly, by comparison to other offenders, Cunningham had a relatively small library of images. In *United States v. Moore*, 567 F.3d 187 (6th Cir. 2009), the defendant had "7,000 to 8,000 pornographic images on his computer, over 5,000 of which were graphic sexual depictions of children under the age of 12." *Id.* at 189. In *United States v. Mellies*, 329 Fed. Appx. 592 (6th Cir. 2009), the defendant possessed roughly 11,000 images, including images of 499 "known victims," and another 200 videos of child pornography. *Id.* at 609. Thus, Cunningham is correct

30

that his relatively small number of images warrants against a penalty approaching the statutory maximum.

Based upon all of the above, the Court finds that a sentence of 121 months is appropriate. In reaching this conclusion, the Court notes that it was presented with options from the mandatory minimum of five years to the statutory maximum of twenty years.   Cunningham's sentence falls roughly at the peak of the bottom one-third of this range.   The sentence is 61 months above the mandatory minimum, but also 119 months below the statutory maximum.   As described above, the size and type of collection possessed by Cunningham weigh in his favor.   However, his acts of distribution and possession of sadistic images compel the Court to conclude that a 121 month sentence is sufficient but not greater than necessary.

## VII.   Sentencing Disparities

In the Court's research, it has become clear that sentences for child pornography defendants vary wildly from court to court.   With a growing number of district judges finding that the Guidelines in this area are entitled to no deference, sentencing disparities are bound to grow exponentially.   This Court has carefully reviewed sentences from across the district, circuit, and country when fashioning its sentence.   Based upon the particular facts of this matter, the Court has determined that there exist no unwarranted sentencing disparities between Cunningham and other offenders.

First, it is all too often reported that the child pornography Guidelines are unduly harsh. Recently, more and more district court judges have been heard to complain that these Guidelines, coupled with mandatory minimums, unduly restrict our discretion.   However, these comments fail to take into account that it was the widespread abuse of such discretion that mandated the

31

adoption of the Guidelines.   Sentencing disparities were the norm, rather than the exception, prior to the adoption of the Guidelines.   Congress effectively reined in the Courts' discretion. Following *Booker* and its progeny, district judges have regained a significant amount of discretion in sentencing.   However, in the realm of the child pornography Guidelines, that discretion remains limited by the statutory mandatory minimum put in place by Congress.   Thus, we in the judiciary must walk a fine line, utilizing our discretion carefully, while also recognizing the intent of Congress to properly punish child pornography.

The Court also notes that the focus of nearly every argument regarding the child pornography Guidelines is on the harm to the *offender*, rather than the harm to the victim.   Given the type of crime at issue, that type of analysis is troubling.   In that regard, however, the legal system has come a long way in recognizing the very real harms caused by child pornography. Courts now universally recognize that the harm to victims is permanent and ongoing.   While there is still a vocal minority that contends that possession of child pornography is a victimless crime, that position has gained little traction in the court system.   *See United States v. Goff*, 501 F.3d 250, 259 (3d Cir. 2007) (chastising a district court for failing to recognize that child pornography is more than just a psychiatric crime).   In this regard, the Supreme Court has observed as follows:

> The legislative judgment, as well as the judgment found in the relevant literature, is that the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child. ...

> It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults. Sexual molestation by adults is often involved in the production of child sexual performances. When such performances are recorded and distributed, the child's privacy interests are also invaded....

> The distribution of photographs and films depicting sexual activity by juveniles is

intrinsically related to the sexual abuse of children .... [T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. ...

As one authority has explained:

"[P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography." Shouvlin, *Preventing the Sexual Exploitation of Children: A Model Act*, 17 Wake Forest L.Rev. 535, 545 (1981). *See also* [Schoettle, *Child Exploitation: A Study of Child Pornography*, 19 J. Am. Acad. Child Psychiatry 289, 292 (1980)] ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); Note, *Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation*, 12 U. Mich. J. Law Reform 295, 301 (1979) (interview with child psychiatrist) ("The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child").

*New York v. Ferber*, 458 U.S. 747, 758-59 & nn. 9-10 (1982) (citations omitted).

Children are exploited, molested, and raped for the prurient pleasure of [the defendant] and others who support suppliers of child pornography. These small victims may rank as "no one else" in [the defendant's] mind, but they do indeed exist outside his mind. Their injuries and the taking of their innocence are all too real. There is nothing "casual" or theoretical about the scars they will bear from being abused for [the defendant's] advantage.

*Goff*, 501 F.3d at 259.  The National Center for Missing and Exploited Children has also explained the effects of child pornography on its victims:

Because children are sexually abused in the creation of the pornographic images, they can incur physical injuries such as genital bruising, cuts, lacerations and sexually transmitted diseases.  The children may suffer psychological injuries including depression, anger, withdrawal, low self-esteem and feelings of worthlessness. These feelings may be expressed in flash-backs, nightmares and other indicia of post-traumatic stress syndrome.  They often engage in self-destructive behavior including substance abuse, prostitution, depression and suicide.

33

> When the pornographic images are viewed by others, the children depicted are victimized once again. The mere knowledge that images exist and are being circulated causes shame, humiliation and powerlessness.  This victimization lasts forever since the pictures can resurface at any time, and this circulation has grown exponentially because of the Internet.  As one expert explained: "The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child."   At a more fundamental level, child pornography victims' rights of privacy and human dignity are violated when their images are circulated and viewed by others.   The possessor thus has real victims and inflicts actual harm upon them by his conduct.

Professor Audrey Rogers, *Child Pornography's Forgotten Victims*, 28 Pace L.Rev. 847, 853-54 (2008) (footnotes omitted).

Despite these above references, the Court cannot help but infer that some have continued to believe that simple possession of child pornography is a private offense, affecting no one other than the individual possessing the image.    *See, e.g., Baird*, 580 F.Supp.2d at 895 (distinguishing individuals that solely possess child pornography from "actual predator[s] or abuser[s]").   As a result, arguments and media articles about "unduly harsh" sentences continue to flourish, while mention, even in passing, of the harm caused by possession of these images is rare.   Perhaps this is nothing more than a failure to educate the public about the very real harms caused by possession of these images.   Regardless of the reason, the Court categorically rejects any argument that possession and distribution of child pornography does not warrant what Cunningham's alleges is a harsh sentence.   Accordingly, the Court does not find any *unwarranted* disparity between Cunningham and other similarly situated defendants.

## VII.   Conclusion

Based upon the above reasoning, pursuant to the Sentencing Reform Act of 1984 and 18 U.S.C. § 3553, it is the judgment of the Court that the Defendant Thomas Cunningham is hereby

34

committed to the Bureau of Prisons for a term of 121 months.    Specifically, Cunningham is sentenced to 121 months on Count 1, 121 months on Count 2, and 120 months on Court 3, with all three sentences to be run concurrently.    The Court stated the remaining terms of Cunningham's sentence on the record and in its journal entry of conviction.    Accordingly, it declines to reiterate those terms herein.    The Court, however, reiterates in closing that it would have imposed this sentence utilizing the factors contained in § 3553(a), even absent any deference to the Guidelines.

Finally, at the close of sentencing, Cunningham requested that the Court recommend him for placement in a halfway house for 12 months under the Second Chance Act.    The Second Chance Act requires early release determinations to be made on an individual basis based upon criteria provided in 18 U.S.C. § 3621(b).    Those criteria include the history and characteristics of the prisoner.    Due to the nature of this offense, Cunningham will no doubt receive sexual offender treatment while incarcerated.    Moreover, it will be more than eight years before Cunningham is eligible to be moved to a halfway house.    Accordingly, the Court finds that any recommendation by the undersigned would be premature.    As such, the Court declines to make any recommendation regarding the Second Chance Act.

IT IS SO ORDERED.


__January 26, 2010____                        ____/s/John R. Adams_____
Date                                          JOHN R. ADAMS
                                              UNITED STATES DISTRICT JUDGE